## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JODERRICK GOLDEN, | ) | CASE NO. 1:18CV00636 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, JoDerrick Golden, ("Plaintiff" or "Golden"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.   PROCEDURAL HISTORY

In August and September 2014, Golden filed an application for POD, DIB, and SSI, alleging a disability onset date of December 10, 2013 and claiming he was disabled due to schizoaffective disorder bipolar type, post traumatic stress disorder, pancreatitis, diverticulitis, heart disease, back problem, gout, headaches, asthma, alcohol dependence, and cocaine dependance.  (Transcript ("Tr.") 240, 242, 276.)  The applications were denied initially and upon reconsideration, and Golden requested a hearing before an administrative law judge ("ALJ").  (Tr. 142, 151, 159, 162, 173, 181.)

On November 30, 2016, an ALJ held a hearing, during which Golden, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 30.)  On February 23, 2017, the ALJ issued a written decision finding Golden was not disabled.  (Tr. 8-29.)  The ALJ's decision became final on February 21, 2018, when the Appeals Council declined further review.  (Tr. 1.)

On March 20, 2018, Golden filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13.)  Golden asserts the following assignments of error:

  (1)    Whether the ALJ properly evaluated the opinions of Mr. Golden's treating physicians.

  (2)    Whether substantial evidence supports the ALJ's rejection of Plaintiff's reliance upon a cane.

(Doc. No. 11.)

# II.   EVIDENCE

## A.    Personal and Vocational Evidence

Golden was born in March 1969 and was 47 years-old at the time of his administrative

2

hearing, making him a "younger" person under social security regulations.  (Tr. 21.)  *See* 20

C.F.R. §§ 404.1563(c) & 416.963(c).  He has a limited education and is able to communicate in

English.  (*Id.*)  He has past relevant work as a machine operator, assembler of motor vehicles,

and truck driver.  (Tr. 20.)

**B.**     **Medical Evidence**

**1.**          **Mental Impairments[2]**

On April 1, 2014, Golden visited social worker Amber Davis, LISW-S, at Northeast Ohio

Neighborhood Health Services ("NEON"), for his bipolar disorder.  (Tr. 805.)  He reported

anxious, fearful thoughts, depressed mood, a history of drug abuse, extensive legal issues, and

uncontrolled anger.  (*Id.*)  He indicated he had been sober since February 4, 2014 and was

attending three AA meetings a week.  (*Id.*)  On examination, Golden displayed poor insight and a

tangential thought process.  (Tr. 806.)  Ms. Davis diagnosed bipolar disorder and polysubstance

dependence.  (Tr. 807.)  She assigned Golden a Global Assessment of Functioning ("GAF")

score[3] of 48 and referred him for a psychiatric evaluation.  (*Id.*)

On April 24, 2014, Golden underwent an Adult Diagnostic Assessment at Connections

---

[2]     The Court notes its recitation of the medical evidence is not intended to be
exhaustive, and is limited to the evidence cited in the parties' briefs.

[3]     The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 41 and 50
indicates serious symptoms or any serious impairment in social, occupational or
school functioning. A recent update of the DSM eliminated the GAF scale
because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

with nurse Rochelle Walzman, R.N.  (Tr. 468.)  He indicated he was taking Lithium for his bipolar disorder, but was still hearing voices and seeing shadows.  (*Id.*)  He also reported panic attacks, poor focus and memory, and racing thoughts.  (Tr. 472, 473.)  Nurse Walzman diagnosed Golden with schizoaffective disorder, cocaine abuse, panic attacks without agoraphobia, and PTSD.  (Tr. 475.)  She assigned a GAF score of 38.  (*Id.*)

Golden visited psychiatrist Gregory Boehm, M.D., on July 15, 2014.  (Tr. 643.)  He reported panic attacks, anxiety, racing thoughts, depression, loneliness, and auditory hallucinations.  (*Id.*)  Dr. Boehm diagnosed bipolar disorder, generalized anxiety disorder, and addiction disorder.  (Tr. 645.)  He assigned Golden a GAF score of 40.  (*Id.*)

Golden returned to Dr. Boehm on August 9, 2014, describing continued hallucinations, suicidal ideation, and depression.  (Tr. 639-641.)  On examination, his judgment, memory, and insight were intact and his attention and concentration were normal.  (Tr. 640.)  Dr. Boehm assigned Golden a GAF score of 45 and prescribed Wellbutrin, Seroquel, and Lithium.  (Tr. 641.)

On October 28, 2014, Golden reported to Dr. Boehm, that while he avoided people, he attended AA 1-2 times each week.  (Tr. 1063.)  He was depressed and anxious, with suicidal ideation.  (*Id.*)  He indicated his medication had been helping, but since his Seroquel was not delivered, he had been having difficulty sleeping.  (*Id.*)  Dr. Boehm assigned a GAF score of 50, and prescribed Seroquel, Lithium, Wellbutrin, and Doxepin.  (Tr. 1064.)

On November 6, 2014, Dr. Boehm filled out a form prepared by the Social Security Administration regarding Golden.  (Tr. 833-834.)  He listed Golden's symptoms as hallucinations, depression with mood swings, and suicidal ideation.  (Tr. 833.)  He noted Golden's treatment included group therapy, AA meetings, and medication monitoring

appointments.  (Tr. 834.)  Dr. Boehm opined Golden could not "sustain attention on work," as he would "easily regress" and decompensate.  (*Id*.)  He concluded Golden could not "endure stress." (*Id*.)

Golden visited therapist Shanell Gist, B.S., at Recovery Resources on November 13, 2014.  He indicated his medications were helpful, but he was having difficulty controlling his anger.  (Tr. 1056.)  Ms. Gist assigned a GAF score of 58.  (*Id*.)

On December 5, 2014, Golden returned to Dr. Boehm, reporting that while he was depressed and irritable, his condition was "greatly improved."  (Tr. 1052.)  He continued to report auditory hallucinations and suicidal ideation, but indicated they were lessened on his medications.  (*Id*.)  His judgment and insight were intact on examination.  (*Id*.)  Dr. Boehm assigned a GAF score of 50 and refilled Golden's medications.  (Tr. 1053.)

On January 20, 2015, Dr. Boehm filled out a "Medical Source Statement: Patient's Mental Capacity" form regarding Golden.  (Tr. 1076-1077.)  Dr. Boehm found the following restrictions for Golden:

- He could occasionally:

    - follow work rules;
    - maintain attention and concentration for extended periods of 2-hour segments;
    - respond appropriately to changes in routine settings;
    - maintain regular attendance and be punctual within customary tolerances;
    - relate to co-workers;
    - understand, remember, and carry out complex job instructions;

- He could rarely:

    - use judgment;
    - deal with the public;

- interact with supervisors;
- function independently without redirection;
- work in coordination with or proximity to others without being distracted or being distracting;
- deal with work stress;
- complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
- understand, remember, and carry out detailed, but not complex job instructions;
- understand, remember, and carry out simple job instructions;
- maintain appearance;
- socialize;
- behave in an emotional stable manner;
- relate predictably in social situations;
- manage funds/schedules; and
- leave home on his own.

(*Id.*)

An August 27, 2015 treatment note from Recovery Resources indicates Golden was progressing towards his goals and had a dog in his apartment, which was alleviating his loneliness.  (Tr. 1247.)

On April 4, 2016, Lindsey Kershaw, CNP, a nurse practitioner at Recovery Resources, provided the following statement regarding Golden:

Joederick Golden is currently under the care of Lindsey Kershaw, CNP at Recovery Resources for psychiatric diagnoses.  He will be unable to serve for voluntary work services due to the concern of the stress placing him at high risk for the decompensation of his symptoms.

(Tr. 1315.)

On August 1, 2016, Golden visited nurse practitioner Kershaw at Recovery Resources. Ms. Kershaw noted Golden was last seen in May 2016.  (Tr. 1364.)  Golden reported increasing stress and racing thoughts.  (*Id.*)  He indicated he was walking his dog three times a day and

6

taking his medications as directed. (*Id.*) Golden reported his medications improved his symptoms and decreased his racing thoughts. (*Id.*)

That same date, nurse practitioner Kershaw filled out a "Medical Source Statement: Patient's Mental Capacity" form regarding Golden. (Tr. 1333-1334.) Ms. Kershaw found the following restrictions for Golden:

- He could constantly:

    - maintain regular attendance and be punctual within customary tolerance;
    - understand, remember, and carry out complex, detailed, and simple job instructions;
    - maintain appearance; and
    - manage funds/schedules;

- He could frequently:

    - follow work rules;
    - use judgment;
    - maintain attention and concentration for extended periods of 2-hour segments;
    - function independently without redirection;
    - work in coordination with or proximity to others without being distracting; and
    - leave home on his own;

- He could occasionally:

    - respond appropriately to changes in routine settings;
    - deal with the public;
    - relate to co-workers;
    - interact with supervisors;
    - work in coordination with or proximity to others without being distracted;
    - deal with work stress;
    - complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods;
    - socialize;

- behave in an emotionally stable manner; and
- relate predictably in social situations.

(*Id.*)

### 2. Physical Impairments

On October 2, 2013, Golden presented to the emergency room with a headache.  (Tr. 409.)  Golden received treatment and his symptoms resolved.  (Tr. 412.)

Golden was hospitalized from November 21 through November 24, 2013 for abdominal pain, nausea, and vomiting.  (Tr. 427.)  An abdominal CT scan was consistent with diverticulitis.  (Tr. 375.)  Golden also reported toe pain, which the hospital physicians felt was possibly related to gout.  (Tr. 436.)  He received medications and was instructed to undergo a colonoscopy in 6-8 weeks.  (Tr. 430.)

Golden was hospitalized again from December 21 through December 23, 2013 for acute pancreatitis.  (Tr. 341.)  He indicated he had been drinking 48-96 ounces of beer daily.  (*Id.*)  The hospital physicians confirmed Golden had gout and prescribed steroids.  (Tr. 342.)  Upon discharge, Golden's abdominal pain had improved, he was tolerating a normal diet, and his gout pain had subsided.  (*Id.*)

On March 27, 2014, Golden visited nurse practitioner Erin Duchon, FNP, at Northeast Ohio Neighborhood Health Services ("NEON").  (Tr. 453.)  Golden reported he had asthma and smoked a pack of cigarettes a day.  (*Id.*)  He reported shortness of breath and a headache.  (*Id.*)  Golden also indicated he had not been on his bipolar medications since November 2013 and needed a psych referral.  (*Id.*)  On examination, Golden had left knee tenderness, but his right knee was normal.  (Tr. 454.)  Ms. Duchon ordered a knee x-ray.  (Tr. 455.)

Golden returned to Ms. Duchon on April 3, 2014, reporting a gout flare in his right great

toe and knee.  (Tr. 459.)  His musculoskeletal examination was normal.  (Tr. 460.)  Ms. Duchon

refilled Golden's Prilosec, advised him to stop smoking, and referred him to an orthopedist.  (*Id*.)

An April 7, 2014 left knee x-ray was normal.  (Tr. 553.)  A lumbar spine x-ray confirmed

degenerative facet joint disease.  (Tr. 554.)

On April 14, 2014, Golden visited orthopedist Michael Walker, M.D., for his left knee

pain.  (Tr. 559.)  Golden indicated his left knee had been bothering him since 2007 and denied

any treatment for these symptoms.  (*Id*.)  Dr. Walker noted the recent left knee x-ray displayed no

evidence of any significant abnormalities in the knee joint.  (*Id*.)  Dr. Walker also listed "cane"

under a list of Golden's current medications.  (*Id*.)  On examination, Golden had a normal

ligamentous examination with no loss of motion.  (Tr. 560.)  He had no pain with rotation of the

hip joint and mild tenderness along the medial patellar facet.  (*Id*.)  Dr. Walker diagnosed

bilateral patellofemoral pain and suggested a patellar sleeve and physical therapy.  (*Id*.)  He

recommended Golden take an over-the-counter anti-inflammatory medication.  (*Id*.)

On April 15, 2014, Golden had his initial physical therapy evaluation with physical

therapist Tod Kokensparger, P.T.  (Tr. 581.)  On examination, Golden had a mild valgus

deformity around his left patella and right patella tendon tenderness.  (Tr. 582.)  He had

decreased bilateral lower extremity strength, decreased hamstring flexibility, and a decreased

gait.  (Tr. 583.)  He used a cane during the evaluation and it was painful for him to navigate

stairs.  (Tr. 582.)  Golden did not return for any additional physical therapy appointments.  (Tr.

588, 590.)

On April 16, 2014, Golden visited nurse practitioner Duchon at NEON.  (Tr. 463.)  He

reported he had seen a specialist for his knee, was taking Lithium for his bipolar disorder, and

needed a form completed for housing.  (*Id.*)  On examination, Golden's overall appearance was normal, but he was limping on his right side and using a cane.  (Tr. 464.)

Golden visited primary care physician Gilbert Lowenthal, M.D., on June 24, 2014.  (Tr. 608.)  He reported lower back and right flank pain.  (*Id.*)  Dr. Lowenthal noted Golden was "not working and has not worked since December" and expected "him to be on disability shortly." (*Id.*)  Golden was walking with a cane and "somewhat bent over with a great deal of discomfort." (*Id.*)  Dr. Lowenthal prescribed Flexeril and Toradol.  (*Id.*)  He concluded Golden would "improve shortly" but needed to attend physical therapy.  (*Id.*)

Two days later, on June 26, 2014, Golden visited an emergency room in Indiana for radiating back pain.  (Tr. 523.)  On examination, Golden displayed lumbar paraspinal tenderness, right sacroiliac joint tenderness, and intact sensation.  (Tr. 525.)  The emergency room physicians prescribed Hydrocodone.  (*Id.*)

On June 29, 2014, Golden again visited an emergency room for back pain.  (Tr. 528.)  He reported he had recently attended a church convention in Indiana, where he had visited an emergency room for his back pain.  (*Id.*)  Golden reported the Hydrocodone provided at the Indiana emergency room was unhelpful and his pain was so severe he could "barely stand and walk" and had several "falls or near falls."  (*Id.*)

On examination, Golden was slightly tender in the lower lumbosacral spinal region, but had intact sensation in all of his extremities.  (Tr. 529.)  An MRI revealed the following: (1) a small broad-based right lateral disc herniation at the L4-5 level, which contributed to moderate right foraminal encroachment; (2) a very small, broad-based central disc herniation superimposed on the disc bulging at the L5-S1 level; and (3) no associated canal or foraminal stenosis at the

10

L5-S1 level.  (Tr. 532.)  Upon discharge, Golden had normal strength and sensation and walked with an antalgic gait.  (Tr. 530.)  He was provided pain medications and steroids.  (Tr. 529.)  Golden also reported his "cane was recently stolen and requested a cane in the emergency department and this was ordered."  (Tr. 530.)

On July 3, 2014, Golden returned to the emergency room for lower back pain.  On examination, his lumbar range of motion was restricted in all directions, he had a negative straight leg raise, and full strength in all major muscle groups.  (Tr. 541.)  The emergency room physician reviewed his recent MRI and noted it "revealed a very small central disc herniation at L5-S1 without any nerve root entrapment."  (*Id.*)  Golden was advised to stop smoking, exercise, and take anti-inflammatory medications.  (*Id.*)  He was also prescribed physical therapy.  (*Id.*)

Golden visited physicians' assistant Alexander Klinchenko, PA, on July 9, 2014.  (Tr. 653.)  He reported his lower back pain continued to radiate down his entire right leg and his pain was worse with walking and changing positions.  (*Id.*)  On examination, Golden had an antalgic gait, a limited spinal range of motion, and a positive lying straight leg raise on the right.  (Tr. 654.)  His seated straight leg raise was negative bilaterally.  (*Id.*)  Mr. Klinchenko prescribed Gapapentin and referred Golden to a spine specialist.  (*Id.*)

On February 4, 2015, Golden initially visited primary care doctor Hari Balaji, M.D.  (Tr. 1078.)  He reported a history of back pain, diverticulitis, angina, asthma, bipolar disorder, and right leg and knee pain.  (*Id.*)  On examination, Golden had pain to palpation over his spine.  (Tr. 1079.)  His motor strength, sensation, range of motion, muscle strength, and gait were all normal.  (*Id.*)  Dr. Balaji prescribed Gabapentin and GERD medication.  (Tr. 1082.)

Golden returned to Dr. Balaji on March 5, 2015, reporting he felt "well," with stable

11

depression and COPD.  (Tr. 1098.)  He requested a back brace.  (*Id.*)  On examination, Golden had normal motor strength in his upper and lower extremities and intact sensation.  (Tr. 1099.)  Dr. Balaji continued Golden's Gabapentin prescription and ordered a colonoscopy.  (Tr. 1099, 1100.)

A July 13, 2015 CT scan of Golden's lumbar spine revealed (1) mild lower lumbar degenerative changes; (2) moderate right foraminal stenosis at L4-5; and (3) no critical canal or foraminal stenosis.  (Tr. 1423.)  A July 14, 2015 lumbar spine x-ray confirmed degenerative changes in the lower lumbar spine.  (Tr. 1310.)  An MRI of the thoracic spine was normal.  (Tr. 1311.)  A lumbar MRI revealed right-sided foraminal narrowing at L4-L5.  (Tr. 1312.)

Golden had a consultation with neurosurgeon Joel Siegal, M.D., on July 17, 2015.  (Tr. 1306.)  He reported lower back and neck pain, difficulty sleeping due to an inability to find a comfortable position, and neck pain radiating down both arms.  (*Id.*)  He indicated he was having difficulty picking up objects and his back pain was radiating down his right leg.  (*Id.*)  Dr. Siegal reviewed Golden's recent lumbar MRI, and noting there were "only some mild degenerative changes" and "no sign of cord compression or severe neural compression."  (Tr. 1308.)  He concluded there was no "neurosurgical lesion on the MRIs" and recommended Golden undergo a nerve block and physical therapy to relieve his pain.  (*Id.*)  Dr. Siegal also noted since Golden's neck and hand symptoms were intermittent in nature, he would "hold off" on ordering any cervical spine diagnostic studies.  (*Id.*)

On July 20, 2015, Golden visited Dr. Balaji, reporting he did not feel well and had been hospitalized for diverticulitis.  (Tr. 1273.)  On examination, Golden had normal motor strength in his upper and lower extremities and intact sensation.  (Tr. 1274.)  Dr. Balaji recommended

12

Golden visit a pain management physician and a gastroenterologist.  (*Id.*)  That same date, Dr. Balaji also filled out a form for a disability placard, finding "due to the above disabilities [patient] is unable to walk more than 100 yards without help."  (Tr. 1275.)

Golden underwent a colonoscopy on September 14, 2015, which revealed "very mild diverticulitis and mild internal hemorrhoids."  (Tr. 1294.)  On December 1, 2015, Golden visited gastroenterologist James M. Boyle, M.D., for his chronic abdominal pain and pancreatitis.  (Tr. 1286.)  He indicated he had been sober for "a long time" and had cut down significantly on smoking cigarettes.  (*Id.*)  Dr. Boyle prescribed Tramadol for pain and noted Golden was walking with a quad cane.  (Tr. 1286-1287.)

On December 21, 2015, Golden visited Dr. Balaji, reporting he was feeling well.  (Tr. 1279.)  He indicated he had visited pain management, but was unable to received injections due to his insurance.  (*Id.*)  He described "whole body muscle spasms," but denied painful joints or weakness.  (Tr. 1279, 1280.)  On examination, Golden had a full range of motion in his neck, normal motor strength in his upper and lower extremities, and intact sensation.  (Tr. 1281.)  Dr. Balaji provided him with a sample Flector patch and recommended physical therapy.  (Tr.  1279.)  Dr. Balaji also prescribed Neurontin, Tramadol, Cyclobenzaprine, and a GERD medication.  (Tr. 1281.)

On June 22, 2016, Dr. Balaji filled out a "Medical Source Statement: Patient's Physical Capacity" form regarding Golden.  (Tr. 1331-1332.)  Dr. Balaji found the following restrictions for Golden:

- He can occasionally lift/carry 10 pounds;

- He can stand/walk for 1 hour total in an 8-hour workday;

13

- His ability to sit is unrestricted;

- He can rarely climb, balance, stoop, crouch, kneel, and crawl;

- He can occasionally reach;

- He can rarely push/pull;

- He can frequently perform fine and gross manipulation;

- He has restrictions in his ability to be exposed to temperature extremes and pulmonary irritants;

- He has been prescribed a cane, breathing machine, and oxygen;

- He experiences severe pain; and

- He will need to elevate his legs at a 45 degree angle at will.

(*Id.*)

Golden underwent pulmonary function testing on September 28, 2016.  (Tr. 1399.)  The testing revealed a mild small airway obstruction.  (*Id.*)  On October 5, 2016, Golden visited pulmonologist Lee Ann Baggott, M.D., reporting wheezing, coughing, and dyspnea with exertion.  (Tr. 1391.)  On examination, Golden's breathing was normal.  (Tr. 1394.)  Dr. Baggott diagnosed mild small airway obstruction (early COPD and smoking related lung disease) and advised Golden to stop smoking, use an inhaler, and undergo a stress test to rule out any cardiac cause for his symptoms.  (Tr. 1397.)

On January 6, 2017, Dr. Balaji signed a form for the Ohio Department of Job and Family Services certifying Golden required 14 hours a week of home health service for assistance with activities of daily living and light housekeeping.  (Tr. 1531-1532.)

## C.    State Agency Reports

### 1.    Mental Impairments

14

On November 23, 2014, state agency physician Carl Tishler, Ph.D., reviewed Golden's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 72-73.)  He concluded Golden had (1) moderate restrictions in activities of daily living; (2) moderate restrictions in maintaining social functioning; (3) moderate restrictions in maintaining concentration, persistence, and pace; and (4) no episodes of decompensation.  (Tr. 73.)  Dr. Tishler also completed a Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 76-78.)  Within this Assessment, Dr. Tishler found Golden was moderately limited in his ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; and (4) respond appropriately to changes in the work setting.  (*Id.*)  He concluded Golden was not significantly limited in his abilities to (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work-related decisions; (7) complete a normal work day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) ask simple questions or request assistance; (9) accept instructions and respond appropriately to criticism from supervisors; (10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (11) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (12) be aware of normal hazards and take appropriate precautions; (13) travel in unfamiliar places or use public transportation; and

15

(14) set realistic goals or make plans independently of others.  (*Id*.)  Dr. Tishler explained the

basis of his decision as follows:

> Limited to [simple, routine tasks].
>
> \*\*\*
>
> Limited to [simple, routine tasks] that do not require extended periods of
> attention and concentration.
>
> \*\*\*
>
> Limited to no interactions with general public and occasional interactions
> with co-workers.
>
> \*\*\*
>
> Limited to static work setting.

(Tr. 76-78.)

On February 12, 2015 state agency physician Karla Voyten, Ph.D., reviewed Golden's

medical records and completed a PRT and Mental RFC Assessment.  (Tr. 111, 115-117.)  She

adopted the findings of Dr. Tishler.  (*Id*.)

### 2.      Physical Impairments

On November 13, 2014, state physician Rannie Amiri, M.D., reviewed Golden's medical

records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 74-

76.)  Dr. Amiri determined Golden could lift and carry 20 pounds occasionally and 10 pounds

frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in

an 8-hour workday.  (Tr. 74.)  Dr. Amiri further found Golden could frequently climb ladders,

ropes, or scaffolds, frequently stoop, kneel, crouch, and crawl, and avoid concentrated exposure

to environmental irritants.  (Tr. 75-76.)

16

On April 2, 2015, state agency physician Leanne M. Bertani, M.D., reviewed Golden's medical records and completed a Physical RFC Assessment.  (Tr. 113-114.)  Dr. Bertani determined Golden could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 113.)  She limited Golden to occasional pushing and pulling with the bilateral extremities.  (*Id*.)  Dr. Bertani determined Golden could frequently climb ramps and stairs, occasionally climb ladders, ropes, and scaffolds, and frequently balance, stoop, kneel, crouch, and crawl.  (Tr. 113-114.)  Dr. Bertani further found Golden should avoid concentrated exposure to environmental irritants and unprotected heights.  (Tr. 114.)

**D.    Hearing Testimony**

During the November 30, 2016 hearing, Golden testified to the following:

- He completed school through the eleventh grade.  (Tr. 34.)  He never obtained his GED.  (*Id*.)  He attended trade school and received his Class A CDL license.  (Tr. 35.)  He lost his license several years ago due to an OVI charge.  (*Id.*)  He last used drugs and alcohol in January 2016.  (Tr. 54.)

- He last worked as a machine operator.  (Tr. 36.)  He also worked on an assembly line and as a semi-truck driver.  (Tr. 38-40.)

- He lives alone with his dog.  (Tr. 41.)  He does not take her for walks, but he lets her out into a fenced in area.  (Tr. 42.)  He does not drive and depends on either paratransit or his wife to take him to appointments.  (*Id*.)  His wife also visits once a week to clean.  (Tr. 43.)  He can prepare simple meals in the microwave.  (Tr. 44.)

- He has chronic lower back pain which radiates down his left leg.  (Tr. 47.)  He cannot sit or focus for long periods.  (Tr. 42.)  He cannot stand for long periods due to his chronic back pain, sciatic nerve, and muscle spasms.  (Tr. 43.)  He sleeps poorly at night and has low energy levels during the day.  (*Id*.)  His back and legs occasionally give out.  (Tr. 50.)

- He uses a cane to ambulate.  (Tr. 44.)  He has been using this cane since 2014.  (*Id*.)  He does not recall the physician's name who prescribed it.  (*Id.*)  This cane

17

was prescribed to provide support due to his back and knee problems.  (*Id*.)  He uses this cane daily both in and out of his home.  (Tr. 45.)

- He has suicidal thoughts on a daily basis.  (Tr. 46.)  He hears voices, is paranoid, and does not like to be around other people.  (*Id*.)  He takes medications for these issues, which are helpful, but make him tired.  (*Id*.)

The VE testified Golden had past work as machine operator (D.O.T. #617.482-010), assembler, motor vehicle (D.O.T. #806.684-010), and truck driver (D.O.T. #904.383-010).  (Tr. 56.)  The ALJ then posed the following hypothetical question:

Then if you would, consider a person the same age, education and work experience as the claimant with the capacity for light work.  But limited to stand/walk for four hours in an eight-hour workday.  Sit six hours in an eight-hour workday.  Push/pull with the bilateral lower extremities occasionally.  Climb ramps and stairs frequently.  Climb ladders, ropes, and scaffolds never.  Balance, stoop, kneel, crouch, crawl frequently.  Avoid concentrated exposure to extreme fumes, odors, dust, gases, poor ventilation, and pulmonary irritants, vibration, avoid extreme exposure to hazards such as industrial machinery and unprotected heights.  With the capacity to perform simple, repetitive tasks that do not require extended periods of attention and concentration and extended is defined as over two hours at a time. With the capacity to work where there are no interactions with the general public and occasional interactions with coworkers.  The ability to work in a static work setting.

(Tr. 56-57.)

The VE testified the hypothetical individual would not be able to perform Golden's past work.  (Tr. 57.)  The VE explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a sorter (D.O.T. #521.687-086); addresser (D.O.T. #209.587-010); and table worker (D.O.T. #739.687-182).  (Tr. 57-58.)  The VE further testified the added restriction of a cane for standing and ambulating would be preclusive of all work.  (Tr. 58.)

18

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Golden was insured on his alleged disability onset date, December 10, 2013, and remained insured through June 30, 2015, his date last insured ("DLI.")  (Tr. 13.)  Therefore, in order to be entitled to POD and DIB, Golden must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2.    The claimant has not engaged in substantial gainful activity since December 10, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, asthma, affective disorder, and substance abuse disorder (20 CFR 404.1520(c) and 416.920(c)).

20

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the following: lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 4 hours and sit 6 hours of an 8 hour workday, push/pull with the bilateral lower extremities occasionally, climbing ramps/stairs frequently, climb ladders/ropes/scaffolds never, balancing, stooping, kneeling, crouching, and crawling frequently, avoid concentrated exposure to fumes, odors, dusts, gasses[sic], and poor ventilation, avoid concentrated exposure to hazards such as industrial machinery and unprotected heights, can perform simple, repetitive tasks that do not require extended periods of attention and concentration, "extended" is over 2 hours at a time, can work where there are no interactions with the general public and occasional interactions with co-workers, and can work in a static work setting.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on March **, 1969 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 10, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

21

(Tr. 13-22.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the

22

Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      First Assignment of Error: Treating Source Opinions**

In his first assignment of error, Golden argues the ALJ failed to properly evaluate the

23

opinions of his treating sources, Drs. Balaji and Boehm.  (Doc. No. 11 at 14, 17.)  He asserts the

ALJ's treatment of Dr. Balaji's opinion was "based off a grossly inadequate review of the

evidentiary record."  (*Id*. at 14.)  Golden contends the limitations assessed by Dr. Balaji "are

consistent with and supported by the objective evidence of record."  (*Id*.)  Golden also argues the

ALJ's analysis of Dr. Balaji's opinion "did not utilize the appropriate criteria and is factually

incomplete."  (*Id*. at 16.)  As to Dr. Boehm's opinion, Golden contends the ALJ "erroneously

rejected these findings and opinions by citing to one patient note" which documented

improvement.  (*Id.* at 18.)  He asserts "temporary improvement is not a good reason to reject a

treating physician opinion."  (*Id*.)

    The Commissioner maintains the ALJ properly considered the opinions of Drs. Balaji

and Boehn.  (Doc. No. 13 at 8.)  She contends Dr. Balaji provided no objective support for his

opinions which "significantly devalued the opinion."  (*Id*. at 9.)  The Commissioner also argues

the medical evidence and Dr. Balaji's own treatment notes were inconsistent with his opinion.

(*Id*. at 10.)  The Commissioner asserts "the evidence [cited by Golden in his brief] does not exist

and therefore cannot rectify Dr. Balaji's opinion."  (*Id*. at 11.)  As to Dr. Boehm's opinion, the

Commissioner disputes Dr. Boehm's status as a treating source, asserting Golden had only saw

him twice.  (*Id*. at 12.)  The Commissioner also argues Dr. Boehm's opinions were inconsistent

with his own treatment notes and asserts Golden "has not provided any evidence that the ALJ

cherry-picked data."  (*Id*.)

    A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is

not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of*

24

*Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[4]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

        If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

---

[4]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[5]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec*., 535 Fed. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

Moreover, an ALJ must consider the findings and opinions of the state agency medical

26

consultants, because the "Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §404.1513a(b)(1).  When doing so, an ALJ will evaluate the findings using the relevant factors in §§ 404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertise, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions.  20 C.F.R. § 404.1513a(b)(2).  Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight.  *See* 20 C.F.R § 404.1527(e).

### Dr. Balaji

The ALJ weighed the opinion evidence from Dr. Balaji as follows:

> The undersigned has considered the medical opinions of record in rending this decision.  The claimant's doctor, Hari Balaji, M.D., wrote the claimant an order for a disability placard and concluded that the claimant is not able to walk more than 100 yards without assistance (Exhibit 30F at 3).  He also completed a medical source statement on June 22, 2016 (Exhibit 38F).  Dr. Balaji concluded that the claimant would be limited to a reduced range of sedentary exertion work, but could rarely perform postural activities and push/pull.  He would also need to elevate his legs at will 45 degrees.  The undersigned gives little weight to the conclusions of Dr. Balaji.  While he is a treating source, he provides no objective support for his extreme limitations.  In addition, his examination of the extremities was essentially normal when he placed the disability placard order (Exhibit 30F at 3).  The claimant also exhibited full strength in the upper and lower extremities and his sensory examination was intact.  The claimant also denied painful joints.  These findings were essentially unchanged upon follow-up and during his first examination of the claimant (See Exhibits 24F at 2 at 30F at 7).

(Tr. 18-19).

The Court finds the ALJ did not err in assigning less than controlling weight to Dr. Balaji's opinions.  In assigning "little weight" to Dr. Balaji's opinions,[6] the ALJ addressed the consistency and supportability of the opinions, noting Dr. Balaji did not provide any support for his opinions and the opinions conflicted with Dr. Balaji's own treatment notes.  (Tr. 18-19.)  The ALJ then cited directly to the record, noting specifically where Dr. Balaji's opinion was inconsistent with the treatment notes.  The ALJ observed how on the date Dr. Balaji placed the disability placard order, Golden's physical examination was normal.  (Tr. 19, 1274, 1275.)  The ALJ then reviewed two additional office visits with Dr. Balaji, which again found Golden's physical examination to be normal.  (Tr. 19, 1079, 1281.)

Golden asserts the ALJ relied "on an errant conclusion that no objective evidence supports" Dr. Balaji's opinion.  (Doc. No. 11 at 16.)  Golden misunderstood the ALJ's reasoning.  The ALJ discounted Dr. Balaji's opinion because "he provide[d] no objective support for his extreme limitations."  (Tr. 19.)   Contrary to Golden's argument, the ALJ was not rejecting Dr. Balaji's opinion because there was no objective evidence to support it, but because the doctor himself provided no support for his conclusions.  (Tr. 18-19.)

Indeed, while Golden characterizes Dr. Balaji's RFC assessment as one with "specific, function by function limitations," a review of Dr. Balaji's Physical RFC assessment confirms it is a check box form, with no narrative, explanation, or reference to findings to explain Dr.

---

[6]     Golden briefly notes the ALJ did not address Dr. Balaji's order for 14 hours a week of home health assistance.  (Doc. No. 11 at 14.)  It is well settled an ALJ may consider the entire record without addressing each piece of evidence individually.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed.Appx. 496, 507–08 (6th Cir. 2006).  Moreover, this prescription for 14 hours of home health services does not constitute an "opinion" entitled to controlling weight.

Balaji's assessed limitations.  (Doc. No. 11 at 17, Tr. 1331-1332.)  The Sixth Circuit has discounted "check-box analysis" as "weak evidence at best," particularly when it is not accompanied by any supportive findings or records.  *See Shepard v. Comm'r of Soc. Sec.,* 705 Fed App'x 435, 441 (6th Cir. Sept. 26, 2017); *see also Hernandez v. Comm'r of Soc. Sec.,* 644 Fed. App'x 468, 474-475 (6th Cir. Mar. 17, 2016); *Ellars v. Comm'r of Soc. Sec.,* 647 Fed App'x 563, 566 (6th Cir. May 6, 2016)("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . '").  Thus, by noting Dr. Balaji did not provide any support for his conclusions, the ALJ provided a "good reason" for discounting the opinions.  *See Marvin v. Comm'r of Soc. Sec.,* 2018 WL 4214339, *5 (W.D. Mich. Aug. 10, 2018) *report and recommendation adopted by* 2018 WL 4208682 (W.D. Mich. Sept. 4, 2018); *Skaggs v. Berryhill,* 2018 WL 4219194, *4 (W.D. Ky Sept. 5, 2018); *Laporte v. Comm'r of Soc. Sec.,* 2016 WL 5349072, *7 (W.D. Mich. Sept. 26, 2016)("ALJs are not bound by conclusory statements of doctors, particularly when they appear on 'check-box forms' and are unsupported by explanations citing detailed objective criteria and documentation.").

Golden argues the ALJ "did not address any of the factors set forth in 20 CFR §416.927(c)(2)."  (Doc. No. 11 at 17.)[7]  The Court disagrees.  The ALJ specifically noted the

---

[7]     As noted *supra*, when not assigning controlling weight to a treating physician's opinion, the ALJ should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other

supportability and consistency of Dr. Balaji's opinions, two of the factors listed at 20 CFR §416.927(c).  (*See* Tr. 18-19.)  Furthermore, while the ALJ is charged with considering the factors set forth at 20 CFR §416.927(c) when evaluating medical opinion evidence, the ALJ is not required to articulate specific findings as to each of these factors.  Indeed, neither the regulations nor Sixth Circuit case law requires an "exhaustive factor-by-factor analysis." *Francis v. Comm'r,* 414 Fed. App'x 802, 804 (6th Cir. 2011).

Golden also asserts the ALJ "cited limited patient notes, without crediting Mr. Golden's physical therapy, caudal epidural injections, use of a knee sleeve and a cane, and radiologic abnormalities."  (Doc. No. 11 at 16.)  This argument is problematic for several reasons.  First, while Golden attended a physical therapy evaluation in April 2014, he did not return for any further treatment.  (Tr. 581, 588, 590.)  In July 2015, Dr. Siegal recommended a nerve block and additional physical therapy, but Golden did not complete either of these treatment recommendations.  (Tr. 1308.)  Golden does not explain how his failure to undergo recommended treatment supports Dr. Balaji's assessed limitations.  (*See* Doc. No. 11 at 15-16.)  Moreover, the ALJ specifically acknowledged and discussed the positive MRI findings and Golden's use of a cane.  (Tr. 17, 20.)

Further, substantial evidence supports the ALJ's finding Dr. Balaji's opinions were entitled to little weight.  While Golden reported left knee pain to his treatment providers, x-rays of his left knee were completely normal, with no evidence of effusion or significant joint space narrowing.  (Tr. 455, 559.)  During an April 2014 consultation with Dr. Walker, Golden had a

--------

information in the case record relevant to the decision.  *See* 20 CFR §416.927(c)(a revised version of this regulation took effect on March 27, 2017 and applies to claims filed on or after that date.).

30

normal ligamentous examination with no loss of motion, and only mild tenderness along the

medial patella facet.  (Tr. 560.)  In June 2014, Golden visited the emergency room on multiple

occasions for lower back pain radiating into his legs.  (Tr. 515, 523, 528.)  An MRI did confirm

disc bulges with varying levels of neural foraminal stenosis and a "very small" disc herniation

without any nerve root entrapment.  (Tr. 530, 541.)  A July 2015 MRI displayed no signs of cord

or severe neural compression.  (Tr. 1308.)  Moreover, as noted by the ALJ, Golden's

examinations with Dr. Balaji were largely normal.  In February 2015, Golden had normal motor

strength, sensation, spinal range of motion, and gait.  (Tr. 1079.)  In March 2015, Dr. Balaji

noted Golden had normal motor strength in his upper and lower extremities.  (Tr. 1099.)  Dr.

Balaji noted similar findings in July and December 2015.  (Tr. 1274, 1281.)  Despite these

normal examination findings, Dr. Balaji proceeded to limit Golden to walking no more than 100

yards, standing for one hour total in an eight-hour workday, and needing to elevate his legs to 45

degrees at will.  (Tr. 1275, 1331, 1332.)

Accordingly, the Court finds the ALJ met the burden of offering good reasons to

support her decision to assign less than controlling weight to Dr. Balaji's opinions.  This portion

of Golden's first assignment of error, therefore, is without merit and does not provide a basis for

remand.

### Dr. Boehm

The ALJ weighed the opinion evidence from Dr. Boehm as follows:

In November 2014, treating psychiatrist, Gregory Boehm, M.D., concluded
that the claimant cannot sustain attention on work and he cannot handle
stress (Exhibit 17F at 4).  Dr. Boehm completed another medical source
statement on January 20, 2015 (Exhibit 23F).  At that time, he concluded
that the claimant could rarely or only occasionally perform work-related
functions related to making occupational adjustments, intellectual

31

> functioning, and making personal and social adjustments.  The undersigned
> gives little weight to the conclusions of Dr. Boehm.  While he is a treating
> source, his conclusions are inconsistent with his own progress notes.  For
> example, he noted improved depression, cooperative behavior, normal
> speech, coherent and logical associations, intact memory, good attention
> and focus, and intact judgment and insight (See Exhibit 21F at 8).  The
> claimant continued to report hallucinations, but indicated that medications
> helped stop them.

(Tr. 19).

As an initial matter, the Court must address the Commissioner's argument that "it is

arguable whether Dr. Boehm can be considered a treating source."  (Doc. No. 13 at 12.)  The

Commissioner bases this argument on the contention Golden only saw Dr. Boehm twice.  (*Id.*)

Precedent in this Circuit does suggest a physician who treats an individual only twice does not

constitute a treating source.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496,  506–07

(6th Cir. 2006) ("Depending on the circumstances and the nature of the alleged condition, two or

three visits often will not suffice for an ongoing treatment relationship"); *Kepke v. Comm'r of*

*Soc. Sec.*, 636 Fed. Appx. 625, 629 (6th Cir. 2016) ("It was not improper for the ALJ to discount

Dr. Chapman's opinion on the basis that he treated Kepke only three times over a three month

period).  However, Dr. Boehm actually treated Golden four times prior to rendering his January

2015 opinion, not twice as asserted by the Commissioner.  (Tr. 643, 639, 1063, 1052.)  Thus, the

Court will consider Dr. Boehm a treating source, subject to the "treating physician rule."

The Court finds the ALJ did not err in assigning less than controlling weight to Dr.

Boehm's opinions.  In assigning "little weight" to Dr. Boehm's opinions, the ALJ addressed the

consistency of the opinions with the treatment notes.  (Tr. 19.)  The ALJ then cited directly to the

record, noting specifically where Dr. Bohem's opinions were inconsistent with his own treatment

notes.  The ALJ observed how in December 2014, Golden's depression and hallucinations had

improved on medication, and he displayed normal speech, good attention and focus, and intact

judgment, memory, and insight.  (Tr. 19, 1052.)

Golden contends the ALJ "erroneously rejected [Dr. Boehm's opinions] by citing to one

patient note, from December 5, 2014, of some improvement with medication."  (Doc. No. 11 at

18.)  However, this is an inaccurate characterization of the ALJ's decision.  Prior to discussing

Dr. Boehm's opinions, the ALJ reviewed two additional office visits with Dr. Boehm,

acknowledging Golden's depression, anxiety, and hallucinations.  The ALJ discussed how, on

examination, Golden's memory "was intact, he was attentive and focused, speech was clear and

coherent, associations were logical and coherent, and he was cooperative."  (Tr. 18, 640, 1063,

1064.)  Considering Golden visited Dr. Boehm a total of four times, and the ALJ had discussed

three of these visits in the decision, it is disingenuous of Golden to suggest the ALJ had used a

"singular treatment note" to "undermine the history of treatment" between Golden and Dr.

Boehm.  (Doc. No. 11 at 19, Tr. 643, 639, 1063, 1052.)

Golden further argues the ALJ "did not address any of the factors set forth in 20 CFR

§416.927(c)(2)."  (Doc. No. 11 at 19.)  The Court disagrees.  The ALJ specifically noted the

treating source status of Dr. Boehm and the consistency of Dr. Boehm's opinions with the

treatment notes, two of the factors listed at 20 CFR §416.927(c).  (*See* Tr. 19.)  Furthermore,

while the ALJ is charged with considering the factors set forth at 20 CFR §416.927(c) when

evaluating medical opinion evidence, the ALJ is not required to articulate specific findings as to

each of these factors.  Indeed, neither the regulations or Sixth Circuit case law requires an

"exhaustive factor-by-factor analysis."  *Francis,* 414 Fed. App'x at 804.

Moreover, substantial evidence supports the ALJ's finding Dr. Boehm's opinions were

33

entitled to little weight.  Golden sought treatment for his bipolar disorder in April 2014,
reporting anxiety, depression, hallucinations, anger, racing thoughts, and poor memory.  (Tr.
805, 468, 473.)  In July 2014, Golden began to treat with Dr. Boehm at Recovery Resources.
(Tr. 643.)  He continued to report anxiety, auditory hallucinations, and depression.  (Tr. 643.)
Dr. Boehm began to prescribe Golden several medications for his symptoms.  (Tr. 641.)  In
August 2014, Golden's judgment, insight, and memory were intact, and he was attentive and
focused.  (Tr. 640.)  Golden returned to Dr. Boehm in October 2014, indicating he was having
increased stress, and continued to have auditory hallucinations and suicidal ideation.  (Tr. 1063.)
However, Golden also reported he had run out of one of his medications and "feels the medicine
is working."  (*Id.*)  Golden again reported his medications were helping in November 2014.  (Tr.
1056.)

By December 5, 2014, as noted by the ALJ, Golden indicated he was "greatly
improved."  (Tr. 1052.)  He still was experiencing suicidal ideation and auditory hallucinations,
but these symptoms had lessened with his medications.  (*Id*.)  Golden argues noting this
"temporary improvement" was "not a good reason to reject a treating physician opinion."  (Doc.
No. 11 at 18.)  However, Golden does not direct this Court's attention to any treatment notes
which indicate the improvement in his symptoms was only temporary.  To the contrary, an
August 2015 treatment note indicates Golden was progressing towards his goals and had
obtained a dog, which improved his loneliness.  (Tr. 1247.)  An August 2016 treatment note
reveals Golden's anxiety and racing thoughts were improved with medications.  (Tr. 1364.)

Accordingly, the Court finds the ALJ met the burden of offering good reasons to
support her decision to assign less than controlling weight to Dr. Boehm's opinions.  Golden's

34

first assignment of error, therefore, is without merit and does not provide a basis for remand.

**B.      RFC/Use of a Cane**

In his second assignment of error, Golden argues the RFC is not supported by substantial evidence because it does not account for "his reliance upon a cane."  (Doc. No. 11 at 20.)  He asserts the ALJ's decision not to include a limitation for a cane in the RFC "is premised upon unsupported presumptions and selective portions of the evidence and fails to consider the record as a whole."  (*Id*.)  Golden contends the "ALJ largely ignored the evidence concerning the cane, and has erroneously chosen portions of the evidence to fit her conclusion regarding" the RFC.  (*Id*. at 21.)

The Commissioner maintains the "ALJ properly found no medically documented need for a cane."  (Doc. No. 13 at 14.)  The Commissioner acknowledges while a cane was ordered for Golden, "it was not based on any documented medical necessity."  (*Id*.)  The Commissioner argues the normal examination findings and the lack of objective evidence relating to Golden's knee supports the ALJ's decision.  (*Id*. at 15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Relevant to this case, Social Security Ruling 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, *7 (S.S.A. July 2, 1996).

Here, the ALJ determined Golden had the following residual functional capacity:

36

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the following: lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk 4 hours and sit 6 hours of an 8 hour workday, push/pull with the bilateral lower extremities occasionally, climbing ramps/stairs frequently, climb ladders/ropes/scaffolds never, balancing, stooping, kneeling, crouching, and crawling frequently, avoid concentrated exposure to fumes, odors, dusts, gasses[sic], and poor ventilation, avoid concentrated exposure to hazards such as industrial machinery and unprotected heights, can perform simple, repetitive tasks that do not require extended periods of attention and concentration, "extended" is over 2 hours at a time, can work where there are no interactions with the general public and occasional interactions with co-workers, and can work in a static work setting.

(Tr. 16.)

In the decision, the ALJ acknowledged Golden's use of a cane (Tr. 17) and provided the following discussion:

Social Security 96-9p requires that, to find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).  In this case, the claimant brought a cane to the hearing and the record indicates that he uses it at times (as outlined above).  However, the record documents none of the criteria that are necessary to establish medical necessity.  While a cane was ordered for the claimant during an emergency department visit, this was based on his request and report that his prior cane was stolen.  There was no documentation of the need for a cane or a description of the circumstances for which it is needed.  In fact, the claimant exhibited a normal gait, strength, and senses.  There is clinical evidence of some discogenic and degenerative disc disease of the spine; however, there is no clinical evidence of a severe impairment of the knee and no treatment for either other than medication prescribed in response to the claimant's repeated complaints of pain.  Therefore, the undersigned finds that a requirement in the residual functional capacity for an assistive device is not supported.

(Tr. 20.)

The Court finds the ALJ applied the correct legal standards and substantial evidence

37

supports her decision to not provide a limitation for a cane in the RFC.  Golden testified he

began to use a cane in 2014, after receiving a prescription for such from a physician at the

Cleveland Clinic.  (Tr. 44.)  He was unable recall the physicians name, but he reported he used

his cane daily both in and out of his home.  (Tr. 44-45.)  However, Golden's testimony does not

qualify as "medical documentation establishing the need" for a cane under SSR 96-9p.  *Mitchell

v. Comm'r of Soc. Sec.*, 2014 WL 3738270, *12 (N.D. Ohio July 29, 2014); *Parrish v. Berryhill*,

2017 WL 2728394, *12 (N.D. Ohio June 8, 2017), *report and recommendation adopted by* 2017

WL 2720330 (N.D. Ohio June 23, 2017).

Treatment records do document multiple instances in which Golden was ambulating

with a cane.  (Tr. 582, 464, 608, 1287, 472, 645, 640, 1063.)  However, while Golden's

psychiatrist, physical therapist, primary care providers, and gastroenterologist observed Golden

ambulating with a cane on multiple occasions, they did not provide any further explanation or

description as to Golden's use of a cane.  (Tr. 582, 464, 608, 1287, 645, 1063, 640.)  As noted

*supra*, SSR 96–9p makes clear that Golden's medical documentation must establish not only the

need for a cane, but also the circumstances for which it is needed; the record in the present case

fails to meet this standard.  *See Brewer v. Comm'r of Soc. Sec.*, 2011 WL 7546792, *10 (E.D.

Mich. Dec. 11, 2011)("These references to a cane were only peripherally noted in the medical

records as a mere visual observation by a physician of his patient and they cannot be construed

as demonstrating Plaintiff's need for a cane."), *report and recommendation adopted by* 2012 WL

899341 (E.D. Mich. Mar. 16, 2012).

Moreover, a review of the medical evidence of record indicates there also were many

instances in which a cane was not noted.  Treatment notes from NEON in 2014 revealed an

"overall normal" appearance and a normal musculoskeletal examination.  (Tr. 454, 460.)  A July 2014 emergency room visit documented a normal gait and full strength in all of his muscle groups.  (Tr. 541.)  Dr. Balaji noted a normal gait, with normal spinal range of motion and motor strength in February 2015.  (Tr. 1079.)  Golden again had normal motor strength in March and July 2015, and no cane was documented.  (Tr. 1099, 1274.)  In December 2015, Golden denied painful joints or weakness and his motor strength in his lower extremities was normal.  (Tr. 1281.)  Thus, while the medical record may support Golden's assertion he regularly uses a cane, substantial evidence also supports the ALJ's decision to exclude the use of a cane in the RFC.  *See Croom v. Comm'r of Soc. Sec.*, 2014 WL 3418843, *13 (E.D. Mich. July 14, 2014).

Golden points to the physical RFC assessment form filled out by Dr. Balaji, which indicated Golden had been prescribed[8] a cane.  (Doc. No. 11 at 20-21, Tr. 1332.)  However, beyond checking the box indicating a cane was prescribed, Dr. Balaji provided no further detail.  (Tr. 1332.)  He did not describe the circumstances under which Golden required a cane, how long Golden had required a cane, or when it had been prescribed.  (*Id.*)  The "mere notation by a physician that a claimant should use a cane is not evidence of medical necessity."  *Halama v. Comm'r of Soc. Sec.*, 2013 WL 4784966, *8 (N.D. Ohio Sept. 5, 2013).  Moreover, as Dr. Balaji's confirmation of a cane prescription does not indicate "the circumstances for which [the cane] is needed," it does not fulfil the requirements under SSR 96-9p.  *See* SSR 96-9p; *Salem v.*

---

[8]    The Court notes Dr. Balaji also indicated Golden had been prescribed a breathing machine and oxygen.  (Tr. 1332.)  Beyond this form, neither party cites to any evidence establishing Golden required or was prescribed a breathing machine or oxygen.  This further undercuts the reliability of Dr. Balaji's assertions within this form.

*Colvin,* 2015 WL 12732456, *4 (E.D. Mich. Aug. 3, 2015)(finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane.").

Golden also takes issue with the ALJ's treatment of a June 2014 emergency room visit, arguing the ALJ "somehow infers that the cane was not necessary because Mr. Golden requested a new cane, 'after his was stolen.'"  (Doc. No. 11 at 20.)  This argument is without merit.  The medical evidence establishes Golden visited the emergency room for back pain on June 29, 2014.  (Tr. 528.)  After receiving treatment, Golden reported his "cane was recently stolen and requested a cane in the emergency department and this was ordered."  (Tr. 530.)  The ALJ correctly described this incident in the decision.  (Tr. 17, 20.)  Despite Golden's arguments, the ALJ was not inferring the cane was unnecessary because Golden had requested a replacement.  Rather, the ALJ was establishing this incident did not document "the need for a cane or a description of the circumstances for which it is needed," as required under SSR 96-9p.  (Tr. 20.)

In sum, while there may be evidence supporting Golden's use of a cane, substantial evidence also supports the ALJ's RFC determination and its compliance with SSR 96-9p.  An ALJ decision cannot be reversed merely because there exists some other evidence in the record that might support a different conclusion.  *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 833 (6th Cir. 2006) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act without the fear of court interference.") (citation omitted).

Accordingly, Golden has failed to demonstrate the ALJ erred in failing to include in the

RFC a limitation for a cane.  Golden's second assignment of error, therefore, is without merit and does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.


_s/Jonathan D. Greenberg_____
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 12, 2018


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**